Mr. Justice Dayis
delivered the opinion of the court:
The Continental Congress, on the 3d day of October, 1776, being in want of five millions of dollars to prosecute the war, resolved to borrow it on what were called loan-office certificates, and to establish a loan-office in each State for the convenience of the lenders of money. The resolution directed the appointment by the authority of the State of a commissioner of loans, whose duty it was to receive the certificates from the Treasurer of the United States, and to deliver them for such sums of money as he should be able to borrow. The faith of the Government was pledged to redeem these certificates when countersigned by this officer.
In continuation of its policy on this subject, Congress, on the 15th of January and the 22d of February, 1777, provided for a further issue of this class of securities on the basis of the resolutions of the preceding October. Accordingly, certificates in proper form, duly signed by the designated Federal officer, were transmitted to the different loan-offices of the country to be given in exchange for money, when countersigned by the loan officer of the State, and the forty-three which form the foundation of this suit were a part of those which were sent to the loan office of Georgia. The United States deny their obligation to pay the certificates in controversy, because they were not countersigned in conformity with the prescribed regulation of Congress, nor used for their benefit. It will be conceded, if they were not executed as required by the legislation on the subject, that they were irregularly issued, and the United States under no obligation to pay them, unless they are estopped in some Avay from interposing this defense.
It becomes, therefore, of importance, in the first, instance, to ascertain whether E. Davies, jr., who countersigned them, as he says, by order of J. A. Treutlin, governor of Georgia, was commisioner of loans for the State, and whether he negotiated them on account of the United States. Fortunately, these questions were considered in 1792 by Alexander Hamilton, then Secretary of the Treasury, who was charged by Congress with their investigation. In his report of the 28th of *189 March ox that year he states, as the result of diligent inquiry on the subject, that he had been unable to obtain evidence either of the appointment of E. Davies to the office of commissioner of loans .for Georgia, or that he was ever known or reputed to have acted in that capacity, and that there was no evidence that the paper which he put in circulation had been issued for any purpose of the United States. With this report papers were transmitted not only justifying the conclusion reached by the Secretary, but tending strongly to show that the certificates were placed in the hands of Davies by the executive council of Georgia to purchase goods for the State. These papers consist of an affidavit of John Wereat, auditor of Georgia, and a long time resident there, denying that Davies, whom he well knew, was at any time commissioner of loans; of letters from Richard Wyllshyr, commissioner of loans of the State in 1791, giving his opinion to the same effect, and a communication from Samuel Steick, of Governor Houston’s staff, that the certificates were issued on State account. — (Sec American State Papers, class IX, vol. Claims, pages 461-5.) This report, with the accompanying papers, was published, and, of course, read by the holders of the disputed paper. If in their power to deny it, interested as they were to do so, it Avould at least have been attempted. As no contradictory proof was furnished to the Treasury Department, always ready and willing to receive it, it is fair to infer that none existed. But this consideration did not prevent the holders of this paper from seeking to get it funded in 1795. They were met by the accounting officers of the Treasury with the same objections taken by Mr. Hamilton, and as these were not removed, the same result followed. In this condition of things, if the controversy had been between individuals, and there had been another forum to hear and decide it, it would have been resorted to at once, unless the decision of the first tribunal was accepted as final. But the holders of these certificates acted differently. Instead of taking an immediate appeal to Congress from the decision of the Treasury, they waited until two decades had passed away. Nahum Ward says that these identical-certificates were presented to the Treasury in 1792 by Mr. Tallmadge, and remained there until 1812, when they were withdrawn and Congress asked to pay them, on the petition of John Delafield, who professed to possess them in his own *190 right. — (See .Report No. 101, House of Representatives, 19th Congress, 1st session, by Mr. Little, from the Committee on Revolutionary Claims.) Why this delay of twenty years? No reason is even suggested for it, and none can be given which is consistent with the conduct of men in the ordinary affairs of life. It is absurd to suppose that any one, informed of the grounds of objection to a controverted claim, if there were evidence to remove them, would delay action on the subject until thirty-four years had passed since the transaction, out of which the claim had arisen, occurred.
It is said the forum was changed because of newly discovered evidence, and for proof of this we are referred to the reports of Mr. Tallmadge, chairman of the committee, on the petition of John Delafield, made to Congress in 1810, with the accompanying papers. It is hard to reconcile these reports with the ownership of the property as claimed by Nahum Ward. He says the Ohio company has owned the forty-three certificates since 1791, and yet Delafield stated in his petition that he owned them, and wished them funded for his benefit, and we must suppose the Congress of that day, and especially Mr. Tallmadge, believed the fact to be as stated by Delafield. At any rate the Ohio company is estopped from denying the change of ownership, as Ward says that Mr. Tallmadge, who was treasurer of the company from 1791 until 1825, was ordered to sell the certificates by the company, and did sell them at public auction to Delafield. It is true he couples this statement with another, that, notwithstanding Delafield’s purchase, they were considered as the company’s property; but this, would place Mr. Tallmadge in the predicament of aiding, while a member of the national legislature, to procure the payment of a disputed debt for a company of which he was an important officer. — (See Report No. 101, Ho. of Reps., 19th Congress, 1st session.)
And why the necessity of selling at all unless there were an honest purpose of parting with the title to the property ? It surely was as easy to prosecute a just claim before Congress in the name of a corporation, as in the name of a natural person. If, then, Delafield purchased the claim free from any trust, as we are bound to suppose in order to relieve the Ohio company and their treasurer from censure, he did it at his own risk and for a venture, and took it subject to all *191 equities. He cannot plead want of notice of the defenses interposed by the United States, because the company of whom he bought, and of which he was a member, were well informed on the subject. It does not appear how, or when, the title got back in the Ohio company, nor is it of any consequence, as the company occupies the same position in this litigation that Delafield would, had he retained the ownership of the certificates.
But, apart from this view of .the subject, these reports do not change the status of the parties to this controversy. The evidence they furnish comes too late, is chiefly hearsay in its character, and should have no weight in the determination of the-questions in dispute. It consists mainly of lengthy letters from Major Hugh McCall, of Georgia, addressed to Mr. Tallmadge, which seem to be in the nature of arguments against the position taken by the Government. One of them is devoted to a futile effort to prove that Wereat and Steiclc were uninformed of the passing' events during Governor Treutlin’s administration. It is true the certificate of Mr. Sheftall tends to show that Davies did act in the capacity of commissioner of loans, but although it is certified that he had an unusually strong memory, Ave place but little reliance on his recollection in 1816 of AA'hat transpired in the commissary department of Georgia in 1777-’78. Especially do we distrust his memory of these events when it is in opposition to the recollection of others, equally trustworthy, avIio testified in 3792, tAventy-four years nearer the time Avhen the certificates Avere put in circulation.
It is urged that the United States is not in a position to contest the validity of these certificates, because of the payment of interest for a period of four years. The report of Mr. Hamilton takes the ground that the interest was paid by the mistake of the Treasurer, and without authority, and therefore not binding on the United States. It is very clear that there was no purpose on the part of the Government to ratify the acts of Davies, for the paper bearing his name Avas rejected, as soon as the attention of the proper Department was called to it. But it is not necessary to discuss the general rules of law on the subject of ratification, and to show in what state of case they are applicable, for, in our judgment, under the circumstances of this case, as they appear in this opinion, there is no equity raised in favor of the Ohio company against the United States.
*192 'Without pursuing- the subject further, or noticing the various reports in Oongrsss adverse to this claim, we are satisfied it is not a just charge on the Treasury of the United States.
The judgment of the Court of Claims is affirmed.